FILED

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

97 APR 30 PM 3: 27

U.S. DISTRICT COURT
N.D. OF ALABAMA

JACQUELINE McCLAIN,                    ]
                                       ]
    Plaintiff(s),              ]
                                       ]
vs.                                    ]        CV-96-N-0972-S
                                       ]
UNITED PARCEL SERVICE,                 ]
                                       ]
    Defendant(s).              ]

ENTERED

APR 30 1997

### Memorandum of Opinion

### I.   Introduction.

In this employment discrimination action, the plaintiff, Jacqueline McClain ("Ms. McClain"), has brought claims against the defendant, United Parcel Service ("UPS"), pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981") alleging race discrimination.[1] Specifically, she asserts that UPS refused to promote her because of her race and discharged her in retaliation for filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC").

The matter is presently before the court on the defendant's motion for summary judgment, filed on March 17, 1997. The motion has been fully briefed and, upon due consideration, will be granted.

---

[1] The plaintiff's original complaint asserted claims of both race and sex discrimination pursuant to Title VII only. On June 11, 1996, Ms. McClain amended her complaint to include a claim of race discrimination pursuant to section 1981. At the plaintiff's deposition, plaintiff's counsel withdrew the sex discrimination claim. *Plaintiff's Deposition* at 367.

## II.   **Statement of Facts.**[2]

The plaintiff began working for UPS on March 16, 1987, as a part-time data entry clerk. Approximately six months later, her supervisor transferred her laterally to a clerical position in the COD department offering identical wages to those she earned in her former position. He did so because she was having problems with accurate data entry.[3]  In January 1992, while the plaintiff worked in the COD department, she submitted a letter of intent with regard to full-time employment, preferably in data processing. She also applied for a full-time position in data processing, possibly in 1992, but another candidate was chosen, and her supervisor informed Ms. McClain she was less qualified than the chosen candidate. Barry Dean, the COD supervisor, told the plaintiff she was not going to be rehired in the COD department because she was not qualified and that she should apply for positions in customer service. Ms. McClain, however, was not satisfied with Dean's assessment of her abilities, so she submitted a letter to Human Resources. She met with the manager of that department, Bill Mazza, to outline her concerns that she was not being promoted or transferred due to her race. Mazza instructed Roman Williams, a human resources employee, to consult the plaintiff regarding her resume. Ms. McClain gave Williams a copy of her resume, but because Williams was subsequently transferred to another location, she never received a response from him.

---

[2] The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the evidentiary record. These are the "facts" for summary judgment purposes only. They may not be the actual facts. *Cox v. Administrator U.S. Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1400 (11th Cir. 1994).

[3] The plaintiff's coworkers, however, told her that her work was accurate. The supervisor violated UPS policy by transferring her when she had not requested a transfer.

2

Ms. McClain contends she submitted three letters to UPS management in 1992 complaining about her inability to obtain promotions. On April 20, 1992, the plaintiff filed a charge of discrimination with the EEOC, alleging that UPS discriminatorily refused her for a full-time position because of her race and that, because she complained of sex discrimination, her supervisor began a pattern of retaliatory actions against her including reprimanding her for nonexistent violations. In the spring of 1992, Ms. McClain applied for and was offered a full-time position in customer service with an assigned pay grade of 6. She then voluntarily withdrew her EEOC charge.

UPS maintained an attendance policy, called the "Occurrence Policy." The Occurrence Policy as it existed prior to 1996 established that each employee received an "occurrence" when he or she was absent or tardy, with the exception of holidays, vacation days, and prearranged personal days. An employee's sixth occurrence in a nine-month period triggered formal, documented disciplinary action that began with a "talk with" session with the immediate supervisor and progressed to termination on the tenth occurrence.

All vacancies within UPS were announced at Prework Communications Meetings ("PWC Meetings"). These meetings were held ten times per business day, at the beginning of each of the ten shifts. All employees began their work days at the PWC Meetings.

UPS offered its employees a Job Opportunity Program (the "Program"). The Program as it existed in 1994 required employees interested in changing positions within the company to submit a skills assessment form to Human Resources. This form indicated

3

the individual's experience, qualifications, and departmental area of interest. Positions in all UPS departments were available through the Job Opportunity Program. Jacqueline Watley and Stephanie Dobbs, both African-Americans, administered the Program. When a vacancy first occurred, Ms. Watley and Ms. Dobbs ranked by seniority all of the skills assessments submitted for the department that had the vacancy. Then, starting with the most senior applicant, they ensured that the applicant met the minimum qualifications for the position and that he or she had an acceptable attendance record.[4]

Ms. McClain believes she should have been offered one of several promotions instead of the individuals who were ultimately chosen for these positions. First, she contends that she should have been promoted to Customer Service Telephone Center ("CSTC") supervisor instead of Pam Lynch, an African-American, who received the promotion on November 11, 1992. The plaintiff also complains that Lisa Bryant, an African-American, was promoted on September 15, 1995, to Industrial Engineering Administrative Assistant III, a position for which Ms. McClain applied but did not interview. The plaintiff complains that Traci Moore and Tina Durden, both white, were promoted from telephone representative positions to Preferred Customer Associate ("PCA") positions.[5] Ms. Moore and Ms. Durden were awarded the PCA jobs on September 18, 1994, and June 13, 1994, respectively, pursuant to the Job Opportunity Program. Ms. McClain further complains that April Melton, a white, was also promoted from telephone representative to PCA. Ms.

---

[4] An acceptable attendance record was one indicating the employee had fewer than six occurrences in the previous nine months.

[5] From 1992 to 1996, twelve PCA positions became available at UPS.

4

Melton, however, never held a PCA position. On October 3, 1994, UPS changed Ms. Melton's job title from Customer Service Administrative Assistant to National Accounts Administrative Assistant. The plaintiff also complains that Anna McConathy, a white, was promoted to an unidentified position in marketing sometime in 1993 or 1994. UPS cannot identify the position to which Ms. McConathy was allegedly promoted but has determined that Ms. McConathy held the position of Administrative Assistant II when she left the company on April 28, 1995. In that capacity, Ms. McConathy's pay grade was 6, the same as the plaintiff's, but Ms. McConathy worked only part-time, while the plaintiff worked full-time. Ms. McConathy never held a supervisory position at UPS; therefore, any promotion she received in 1994 would have been awarded through the Job Opportunity Program. Because UPS no longer retains the Job Opportunity Program records from 1994, it cannot determine whether Ms. McClain vied for the PCA or part-time Administrative Assistant II positions to which she asserts she should have been promoted. She would have done so by submitting a skills assessment to the Job Opportunity Program administrators. Stephanie Dobbs, Jacqueline Watley, and John Elkins, the UPS employees involved in these promotions, do not recall that the plaintiff placed herself in contention for the positions.

On the date of Ms. Durden's promotion, the plaintiff had at least six occurrences in the previous nine months, while she had at least ten on the date of Ms. Moore's promotion. Such a record would not have been considered acceptable under the guidelines of the Job Opportunity Program.

UPS modified the Job Opportunity Program in 1995 in anticipation of an impending downsizing. Any employee occupying a position scheduled to be eliminated was given

5

priority in the Program, provided he or she mêt the minimum qualifications and applied for a vacancy. UPS waived the acceptable attendance requirement at that time.

Ms. McClain also believes she was discriminatorily denied a promotion to Field Support Technician I in the spring of 1995. She applied for the position, and her supervisor at the time, Kathy Parker-Boswell, completed a Job Opportunity skills assessment, which the plaintiff reviewed and signed. UPS received eighteen such assessments from candidates for the field support position. Ms. Watley and Roger Hanson, a white, administered the selection process and selected five individuals to interview and test, one of whom was the plaintiff. Of the five employees selected, four were African-American and one was white. Each candidate was to demonstrate his or her knowledge in a number of areas through a Technician Applicant Hands-On Skills Assessment. The plaintiff received a rating indicating she had not demonstrated sufficient knowledge in any of the five areas evaluated by the assessment. Each candidate also completed a questionnaire designed to test his or her basic computer knowledge. Ms. McClain failed to answer any of the questions correctly. Ms. Watley and Mr. Hanson selected Alvin Scott, an African-American, to fill the field support position in May of 1995. Mr. Scott demonstrated sufficient knowledge in all areas tested by the Hands-On Skills Assessment and answered almost all of the questions correctly on the questionnaire.

Ms. McClain believes the entire CSTC retaliated against her by disciplining her for actions for which white employees were not disciplined, reprimanding her for being absent from her work station, creating a hostile work environment to induce her to leave her employment, and refusing to promote or transfer her to another department or to notify her

6

of vacant positions. Throughout her tenure as an employee at UPS, the plaintiff reported to a number of supervisors, including Ms. Parker-Boswell, Robert Harness, Pam Lynch, and Tim Johnson, all African-Americans. None of the supervisors or any other member of UPS management ever mentioned Ms. McClain's complaints of discrimination to Human Resources or to the EEOC. John Elkins, the manager of the CSTC, was unaware of the plaintiff's complaints regarding discrimination until July 1995.

On March 17, 1992, Mr. Elkins informally counseled the plaintiff regarding her failure to return on time from her lunch break. Ms. McClain mistakenly believed that Mr. Elkins had given her permission to take an extended lunch. Elkins, however, had told her she could not do so. On March 11, 1994, the plaintiff left her work station without notifying her supervisor. Elkins informally counseled her that she needed to advise a supervisor of any absences from her desk. These two counseling sessions are the only instances in which the plaintiff feels she was disciplined for infractions that white employees were not.

The plaintiff claims that CSTC management subjected her to a hostile environment in retaliation for her complaints of discrimination because she overheard Elkins tell Sergio Torres, District Sales Manager, that he was planning to terminate the plaintiff. Neither Mr. Elkins nor Mr. Torres mentioned the plaintiff's name during the conversation. Ms. McClain further contends that UPS's failure to increase her pay after her 1995 performance review was another aspect of the hostile environment the company created. On May 24, 1995, after the plaintiff complained to Mr. Torres regarding her raise, he and Mr. Elkins explained that her raise was being deferred due to her poor attendance record. She did not dispute that her record correctly reflected her attendance, but she told the men she

7

should not be penalized for being ill. At that time, Ms. McClain's record indicated she had earned six occurrences in the previous three months. The plaintiff further contends that two CSTC supervisors, Robert Harkness and Melody Ward, created a hostile work environment because she overheard Ms. Ward comment that the plaintiff was going to be terminated "because she keeps running to [Human Resources]" and she overheard Mr. Harkness state as well that the plaintiff would be terminated. *Plaintiff's Deposition* at 147-52. She complains that Mr. Harkness and Ms. Ward "talked down to her." *Id.* at 285-86. She also believes that someone created a hostile work environment by placing ink pads and magic markers in her work area chair. The supplies were to be kept in filing cabinets. When she complained to Mr. Elkins about the fumes created by these supplies, he moved her to an area with no air conditioning vents to blow on her. The move alleviated her problems.

In January 1991, Ms. McClain's supervisor counseled her about her failure to notify her supervisor that she was ill. The next month, her supervisor again counseled her because she had accumulated five occurrences over a four-month period. In 1991, Ms. McClain was absent from work a total of eleven days, excluding one week of vacation and four optional holidays. In 1992, the plaintiff's supervisor counseled her about her poor attendance in March, July, and September. In 1992, Ms. McClain was absent from work a total of nine days, again excluding vacation and holidays, and was tardy four times. In February 1993, after the plaintiff had been tardy twice, Mr. Elkins allowed her to arrive at work later, changing the time at which she was to report to work from 8:00 a.m. to 8:30 a.m. He did so because one of her sons was having difficulties at school. On August 3, 1993,

8

Ms. Parker-Boswell, the plaintiff's supervisor at the time, placed a counseling memorandum in the plaintiff's file when, after arranging to take an extended lunch, the plaintiff called in thirty minutes after she was to have returned to state she would be absent the remainder of the work day. At that time, Ms. Parker-Boswell informed the plaintiff that she was no longer eligible to take extended lunches. In 1993, Ms. McClain was absent form work a total of twelve days, excluding vacation and holidays, and was tardy four times. She took disability leave related to her pregnancy from April 30, 1994, through May 19, 1994, and again from August 14, 1994, through February 9, 1995. In 1994, the plaintiff was absent from work a total of sixteen days, excluding vacation, holidays, and 116 days of disability leave, and was tardy twice.

On May 9, 1995, Mr. Elkins counseled Ms. McClain regarding her poor attendance. At that time, her record since her February 11, 1995, return from maternity leave reflected six occurrences and three occasions on which she left work early. On May 24, 1995, Mr. Torres and Mr. Elkins explained to the plaintiff that her performance raise would be deferred due to poor attendance. During a July 19, 1995, meeting, Mr. Rivera explained to Ms. McClain that her attendance was unsatisfactory and that she needed to improve it. Mr. Torres added at that meeting that her next occurrence would lead to further disciplinary action up to and including termination. Mr. Elkins also explained to her that her occurrence level was so high that it would take until July 15, 1996, to decrease her occurrences to five or below so that she could be reviewed for a possible salary increase. At that time, Ms. McClain had accumulated twelve occurrences since her return from maternity leave in February of 1995. It was after the July 19, 1995, meeting that Mr. Elkins

9

moved the plaintiff's work station at her request. Also in 1995, he changed the time at which the plaintiff was to report to work to 10:00 a.m. at her request to allow her to take allergy shots in the morning. On August 11, 1995, Mr. Harkness counseled Ms. McClain about her poor attendance, explaining that she would be disciplined if her attendance did not improve. At that time, she had earned twelve occurrences since February 11, 1995, consisting of eight absences, four tardies, and an unspecified number of occasions on which she left work early. On August 24, 1995, Pam Lynch gave the plaintiff a formal warning about her attendance, explaining she would be further disciplined, up to and including termination, if it did not improve. At that time, Ms. McClain had added another occurrence to her record because she had been tardy. In 1995, the plaintiff was absent from work a total of twenty days, excluding vacation, six optional holidays, and 30 days of disability leave, and was tardy six times.

On January 1, 1996, UPS adopted new Attendance and Punctuality Guidelines. According to the new policy, five sick days and three tardies would not count as occurrences on an employee's record. The second occurrence prompted disciplinary measures, while the employee would be terminated at the sixth occurrence. Ms. McClain did not work in January of 1996. Instead, she took three weeks of vacation, four optional holidays, and four sick days. On January 31, 1996, Ms. Lynch informed the plaintiff that she had only one remaining sick day. The plaintiff then advised Ms. Lynch that she would not be present at work the following day, February 1, 1996. Ms. Lynch told her that after her February 1, 1996, absence, any further absences would count as occurrences.

10

On February 2, 1996, Ms. McClain informed Mr. Elkins that she was considering returning to part-time employment because she had used all of her available leave and had to take her children to the doctor. Mr. Elkins responded that the plaintiff could reduce her hours to part-time as of February 6, 1996, but that he needed her to work her shift on February 2, 1996, or he would terminate her employment. She had eleven occurrences over the past nine months by that date. Ms. McClain did not work on February 2; rather, she went home because her children were not at school due to inclement weather. She was consequently terminated.

Ms. McClain contends that she submitted three letters to UPS management in 1992 complaining about her inability to obtain promotions. She filed an EEOC charge in April 1992 that she later voluntarily withdrew. On July 15, 1995, she submitted a letter to Mr. Torres and Floyd Honts, Alabama District Manager, "charging CSTC management and supervision with discrimination and harassment in an attempt to restrain [her] from advancing within the department and within the company." *Plaintiff's Deposition* at 276; *Defendant's Exhibits 16 and 17*. It was at this time that Mr. Elkins learned of the plaintiff's charges of discrimination. On July 19, 1995, Mr. Torres, Mr. Elkins, and Mr. Rivera met with the plaintiff to discuss her letter. The managers explained the promotion system to Ms. McClain at that time. On October 2, 1995, the plaintiff filed an EEOC charge alleging that UPS had discriminated against her on the basis of race and sex and in retaliation for her previous complaints of employment discrimination. By letter dated January 19, 1996, the EEOC concluded that further investigation would "not likely . . . result in find a violation of [Title VII]" and that she had made "no showing that an act of retaliation [had] occurred."

11

*Plaintiff's Deposition* at Ex. 21. On April 15, 1996, Ms. McClain filed another charge with the EEOC, asserting that UPS had terminated her employment because of her race and in retaliation for having filed the October 2, 1995, charge.

## III.  Summary Judgment Standard.

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is

12

a genuine issue for trial.'" *Celotex*, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings. *Id.* at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Id.* at 249. His guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52; *see also Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11(1983) (indicating the standard for summary judgment is "[s]ubstantively . . . very close" to that for motions for directed verdict). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S.

13

574, 586 (1986). If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are functions of the jury, and, therefore, "[t]he evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## IV. Discussion.

The plaintiff has asserted race discrimination and retaliation claims pursuant to both Title VII and section 1981. A plaintiff who alleges disparate treatment based upon race under Title VII must prove that the defendant acted with discriminatory purpose. *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1184 (11th Cir. 1984). Likewise, section 1981 requires proof of discriminatory intent. *Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n. 16 (1984).

The plaintiff can create a rebuttable presumption of discriminatory intent by establishing a prima facie case. *Young v. General Foods Corp.*, 840 F.2d 825, 828 (11th Cir. 1988), *cert. denied*, 488 U.S. 1004 (1989). A plaintiff may establish a prima facie case

14

in three ways: (1) "by presenting direct evidence of discriminatory intent; [(2)] by meeting the test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 . . . (1973); or [(3)] by demonstrating through statistics a pattern of discrimination." *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (Title VII case); *see also Ramirez v. Sloss*, 615 F.2d 163, 168-69 (5th Cir. 1980) (applying *McDonnell Douglas* burden-shifting analysis to section 1981 claim).

## A.     Direct Evidence.

"Direct evidence of discrimination would be evidence which, if believed, would prove the existence of a fact without inference or presumption." *Carter v. City of Miami*, 870 F.2d 578, 581-82 (11th Cir. 1989) (citations omitted). "[O]nly the most blatant remarks, whose intent could be nothing more than to discriminate . . . constitute direct evidence of discrimination." *Id.* at 582 (footnote omitted). The plaintiff contends that she overheard John Elkins tell Sergio Torres prior to February 2, 1996, that he was planning to terminate the plaintiff's employment and that this is direct evidence of racial discrimination. She claims that this statement conclusively demonstrates that Elkins terminated her because of her race and not because she had attained an excessive number of occurrences. *Opponent's Responsive Submission* at 9-10. It is undisputed, however, that Ms. McClain never heard either Elkins or Torres mention her name. She simply assumes they were discussing her, yet such an assumption is an insufficient basis for direct evidence of discrimination. Furthermore, even if Mr. Elkins were discussing the plaintiff's employment, he did not mention or allude to her race. Accordingly, she has not presented direct evidence of race discrimination as the Eleventh Circuit defines that term and must instead

15

attempt to make out a prima facie case of discrimination through either statistical or circumstantial evidence.

## B.   Statistical Evidence.

A second means by which Ms. McClain may establish a prima facie case is by presenting statistical evidence that demonstrates a pattern and practice of race discrimination. *Early v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990) (age discrimination case). She has not presented any such statistical data, however, and therefore must attempt to establish a prima facie case through circumstantial evidence.

## C.   *McDonnell Douglas* Test.

Where a plaintiff's discrimination claim is based on circumstantial evidence, the court employs the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). First, the plaintiff has the burden of establishing a prima facie case of discrimination.[8]   "Establishment of the prima facie case in effect creates a presumption that the employer unlawfully discriminated against the employee." *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981). The burden of production then shifts to the defendant, requiring an articulation of some "legitimate, nondiscriminatory reason" for the alleged discriminatory employment action. *Id.* "'[I]t is possible for the defendant to present such strong evidence of a nondiscriminatory rationale that summary judgment is warranted.'" *Brown v. American Honda Motor Co., Inc.*, 939 F.2d 946, 950 (11th

---

[8] Under this test, the elements of a prima facie case may be modified to fit the circumstances. "The *McDonnell Douglas-Burdine* proof structure 'was never intended to be rigid, mechanized, or ritualistic. Rather, it is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination.'" *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 594 (11th Cir. 1987) (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983)).

16

Cir. 1991), *cert. denied*, 502 U.S. 1058 (1992) (quoting *Grigsby v. Reynolds Metals Co.*, 821 F.2d 590, 596 (11th Cir. 1987)).

Once the defendant presents a legitimate, nondiscriminatory reason for its action, the presumption of discrimination "drops from the case." *Burdine*, 450 U.S. at 255 & n.10. The plaintiff must then demonstrate by a preponderance of the evidence that the reason offered by the defendant was not the true reason for the employment decision, but rather is a mere pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804. "'[B]ecause the plaintiff bears the burden of establishing pretext [for discrimination], he must present 'significantly probative' evidence on the issue to avoid summary judgment.'" *Isenbergh v. Knight-Ridder Newspaper Sales, Inc.*, 97 F.3d 436, 444 (11th Cir. 1996) (quoting *Young v. General Foods Corp.*, 840 F.2d 825, 829 (11th Cir. 1988), *cert denied*, 488 U.S. 1004 (1989)) (other citations omitted) (alterations in original). The plaintiff may establish that the defendant intentionally discriminated against him "'either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Carter v. City of Miami*, 870 F.2d 578, 584 (11th Cir. 1989) (quoting *Goldstein v. Manhattan Indus., Inc.*, 758 F.2d 1435, 1445 (11th Cir.), *cert. denied*, 474 U.S. 1005 (1985)). "'Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, non-discriminatory reasons for its actions.'" *Isenbergh*, 97 F.3d at 444 (quoting *Young*, 840 F.2d at 830). If a plaintiff succeeds in this burden, the "disbelief of the defendant's proffered reasons, together with the prima facie case, is sufficient circumstantial evidence

17

to support a finding of discrimination" and to preclude summary judgment. *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

### 1. Discriminatory Promotion Practices Claim.

A plaintiff claiming she was not promoted due to her race must establish a prima facie case of such discrimination by demonstrating that (1) she is a member of a protected class; (2) she was qualified for and applied for the vacant position at issue; (3) she was rejected despite these qualifications; and (4) other equally or less qualified applicants who are not members of a protected class were instead selected. *Batey v. Stone*, 24 F.3d 1330, 1334 n. 11 (11th Cir. 1994) (citing *Wu v. Thomas*, 847 F.2d 1480, 1483 (11th Cir. 1988), *cert. denied*, 490 U.S. 1006 (1989)).

In Ms. McClain's deposition testimony, she identified seven positions that she believes UPS denied her because she is African-American: (1) one CSTC Supervisor position; (2) three PCA positions; (3) one Industrial Engineering position; (4) one unidentified Marketing position; and (5) one Field Support Technician I position. *Plaintiff's Deposition* at 226-27, 232, 234-37, 239-40, 242-44. She now claims, however, that only three of these possible promotions involved discriminatory motive on the part of the defendant: two of the PCA positions and the unidentified Marketing position. *Opponent's Responsive Submission* at 14.

The undisputed facts indicate that Traci Moore and Tina Durden, both white, were promoted from telephone representative positions to PCA positions on September 18, 1994, and June 13, 1994, respectively, pursuant to the Job Opportunity Program. The facts also establish that UPS cannot determine the unidentified Marketing position to which the

18

plaintiff refers. Ms. McClain asserts that Anna McConathy, a white, was promoted to this position sometime in 1993 or 1994. Ms. McConathy held the position of Administrative Assistant II when she left the company on April 28, 1995. In that capacity, her pay grade was 6, the same as the plaintiff's; however, she worked only part-time while the plaintiff worked full-time.

The plaintiff has established that she is a member of a protected group, for she is African-American. She has failed to demonstrate, however, that she applied and was qualified for any of the three positions at issue or that she was rejected for any of them. She claims that she was not allowed to apply for the positions because she was not informed of their availability. The undisputed facts, however, show that all vacancies within the company were announced daily at the mandatory PWC Meetings held at the beginning of each shift. Ms. McClain began each work day at such a meeting and therefore would have been privy to this information. While UPS no longer retains the Job Opportunity Program records from 1994 and thus cannot verify whether the plaintiff applied for the positions at issue, Stephanie Dobbs and Jacqueline Watley, the administrators of the Program, do not recall that the plaintiff placed herself in contention for these positions. Regardless of whether Ms. McClain applied for the positions, however, she would not have been eligible due to her record of excessive occurrences. The undisputed facts establish that on June 13, 1994, the date that Tina Durden was promoted to the PCA position, the plaintiff had at least six occurrences in the prior nine months. Likewise, on September 18, 1994, the date Traci Moore was promoted to the PCA position, Ms. McClain had at least ten occurrences in the prior nine months. In fact, at no time during 1994 was her

19

attendance record acceptable such that she could be considered for promotion through the Job Opportunities Program. According to the Program's eligibility policies as they existed in 1994, only employees with fewer than six occurrences in the previous nine months were considered for positions. The plaintiff therefore also would have been ineligible for the unidentified Marketing position to which Anna McConathy was allegedly promoted in 1994.[7] Ms. McClain has presented no other evidence indicating she sought these positions or that she was qualified for them. Accordingly, she has failed to establish a prima facie case of race discrimination with regard to promotion, and the claim will be dismissed.

## 2. **Retaliatory Discharge Claim.**

The plaintiff contends that after she filed her second charge of discrimination with the EEOC in October of 1995, UPS retaliated against her by creating a hostile environment and by ultimately terminating her employment. Title VII protects employees from discrimination by employers because the employee has opposed any practice made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). A plaintiff need not prove the actual existence of those unlawful employment practices; rather, he need only have a reasonable belief that the defendant engaged in such practices. *Wu v. Thomas*, 863 F.2d 1543, 1549 (11th Cir. 1989); *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1140 (5th Cir. Unit

---

[7] Ms. McClain contends that Ms. McConathy was promoted to this position sometime in 1993 or 1994. Her section 1981 promotion claim with regard to promotions occurring before June 12, 1994, are time barred because the statute of limitations for the plaintiff's section 1981 claim is two years prior to the date of her amended complaint, filed on June 11, 1996. *See Goodman v. Lukens Steel Co.*, 482 U.S. 656, 661-62 (1987); Ala. Code § 6-2-38(i). Therefore, the court assumes that Ms. McConathy's alleged promotion occurred sometime between June 12, 1994, and December 31, 1994. Furthermore, the plaintiff's Title VII promotion claims are time barred because they did not occur within 180 days prior to her filing her October 1995 charge of discrimination with the EEOC. *See* 42 U.S.C. § 2000e *et seq.*

A 1981), *cert. denied*, 455 U.S. 1000 (1982). Title VII's protection does not extend to all employment decisions, however. It was "designed to address ultimate employment decisions [and] not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions." *Mattern v. Eastman Kodak Co.*, 104 F.3d 702 (5th Cir. 1997) (citations omitted). Consequently, the court will consider only the plaintiff's claim of retaliatory discharge.

In order to make out a prima facie case of such a claim, Ms. McClain must show that (1) she was engaged in statutorily protected expression, (2) UPS took adverse employment action against her, and (3) there was a causal link between the protected expression and the adverse action. *Lindsey v. Mississippi Research and Dev. Ctr.*, 652 F.2d 488, 491 (5th Cir. Unit A 1981). Once a prima facie case is established, the defendant must articulate some legitimate, nondiscriminatory reason for the plaintiff's termination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). The burden then shifts back to the plaintiff to prove by a preponderance of the evidence that this reason is merely a pretext for discrimination. *Id.* at 804.

In the Eleventh Circuit, "statutorily protected expression" includes filing an EEOC charge, 42 U.S.C. § 2000e-3(a), formal and informal complaints to an employer, *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989), written protests, *Smalley v. City of Eatonville*, 640 F.2d 765, 769 (5th Cir. Unit B 1981), and warnings from employers not to complain about alleged discriminatory practices. *Morgan v. City of Jasper*, 959 F.2d 1542, 1547 (11th Cir. 1992).

21

The plaintiff has established two of the three elements of her prima facie case of retaliatory discharge. She has demonstrated that she engaged in statutorily protected expression by filing two charges of discrimination with the EEOC and that she was subsequently terminated by UPS. She therefore must demonstrate a causal link between the events to meet her burden.

To establish the necessary causal link, Ms. McClain must prove that the protected activity and her termination were "not wholly unrelated." *Hairston v. Gainesville Sun Pub. Co.,* 9 F.3d 913, 920 (11th Cir. 1993). "'At a minimum, a plaintiff must generally establish that the employer was actually aware of the protected expression at the time it took the adverse employment action.'" *Id.* (quoting *Goldsmith v. City of Atmore,* 996 F.2d 1155, 1163 (11th Cir. 1993)). The plaintiff filed her first EEOC charge in April of 1992, claiming that UPS had discriminatorily refused her a full-time position because of her race and that, because she complained of sex discrimination, her supervisor began a pattern of retaliatory actions against her. Shortly after she filed the charge, the defendant offered her full-time employment, and Ms. McClain voluntarily withdrew her charge. She filed a second charge in October of 1995, averring that UPS had discriminated against her on the basis of race and sex and in retaliation for her prior complaints of discrimination. Mr. Elkins became aware of the plaintiff's complaints of discrimination in July of 1995. Because UPS knew of her protected expression at the time it terminated her employment, she has established a causal connection and thus a prima facie case of retaliatory discharge.

According to the *McDonnell Douglas* analysis, the burden then shifts to the defendant to demonstrate that it had a legitimate, nondiscriminatory reason for terminating

22

the plaintiff. It meets this burden. The undisputed facts reveal that Ms. McClain had amassed eleven occurrences during the nine months prior to her termination on February 2, 1996. According to UPS policy as it was amended effective January 1, 1996, once an employee incurred six occurrences within a nine-month period, he or she was subject to disciplinary action, up to and including termination. Therefore, while termination was a discretionary matter, such action was certainly an option. The undisputed facts clearly demonstrate that the plaintiff's attendance record at work was consistently poor from 1991 until her termination. Ms. McClain's various supervisors counseled her in 1991, 1992, 1993, and 1995 for excessive occurrences. She was absent from work eleven days in 1991, nine days in 1992, twelve days in 1993, sixteen days in 1994, twenty days in 1995, and one day in 1996.[8] According to UPS policy, termination was a legitimate disciplinary option that Mr. Elkins decided to employ.

The burden then shifts back to the plaintiff to demonstrate that UPS's asserted reason for terminating her is instead a pretext for retaliation. She cannot meet this burden, however. She has not offered evidence of any employee with a comparable attendance record who was treated differently. Even if the court considers the plaintiff's disputed contention that she was disciplined for leaving work to have her hair done while a white employee who did the same was not disciplined, such evidence is insufficient to prove pretext. She claims that UPS policy did not mandate that Mr. Elkins terminate her for having eleven occurrences in a nine-month period and that he could have granted her

---

[8] These totals do not reflect excused absences, disability leave, vacations, holidays, or personal days.

23

an excused absence so that she could be with her children who were home from school
that day. *Opponent's Responsive Submission* at 8. While this assertion is true, the
evidence readily reflects that UPS had previously given Ms. McClain many opportunities
to improve her attendance habits and that she had not done so. Furthermore, the plaintiff's
contention that Mr. Elkins told Mr. Torres he was going to fire her does not establish
pretext either. Ms. McClain's name was not spoken during the exchange. Moreover, if
Elkins was in fact discussing the plaintiff, he could have just as likely been discussing her
attendance record as discussing her complaints of employment discrimination. The
plaintiff has thus failed to establish pretext. Accordingly, she has not met her burden, and
the retaliatory discharge claim will be dismissed.

## V.   Conclusion.

The defendant's motion for summary judgment will be granted and the plaintiff's
claims of discriminatory promotion practices and retaliatory discharge dismissed with
prejudice. The court will enter an appropriate order in conformity with this memorandum
of opinion.

Done, this 25th of April, 1997.

EDWIN L. NELSON
UNITED STATES DISTRICT JUDGE

24